UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

GLOBAL TECHNOVATIONS, INC.,
ONKYO AMERICA, INC.,

    Debtor,

_____/         CIVIL CASE NO. 10-12781
                                                              HON. MARIANNE O. BATTANI

ONKYO U.S.A. CORPORATION,
ONKYO EUROPE ELECTRONICS
GMBH, ONKYO MALAYSIA SDN.
BHD., and ONKYO CORPORATION,

    Appellants,
v.

GLOVAL TECHNOVATIONS, INC.,
and KENNETH NATHAN, Liquidating
Agent for Onkyo America, Inc.,

    Appellees.
_____/

**OPINION AND ORDER AFFIRMING THE BANKRUPTCY
COURT'S TRIAL ORDER AND JUDGMENT**

Before the Court is Onkyo Europe Electronics GmbH (Onkyo Europe), Onkyo Malaysia Sdn. Bhd. (Onkyo Malaysia), and Onkyo Corporation's (Onyko Japan) (collectively Onkyo or Appellants) appeal of the bankruptcy court's judgment that Global Technovations, Inc.'s (GTI) acquisition of all of the stock of Onkyo America, Inc. (OAI) constituted a fraudulent transfer. The Court has reviewed the relevant filings, and finds

oral argument would not aid in the resolution of this motion.  See E.D. Mich. LR 7.1(e)(2).  For the reasons the follow, the judgment is **AFFIRMED**.

**I.     PROCEDURAL HISTORY**

The facts underlying the dispute began sixteen months before GTI filed for chapter 11, when it purchased all of the stock of OAI in 2000, for $13 million in cash and $12 million in promissory notes, payable to Onkyo in 2003.  In the adversary proceedings before the Bankruptcy Court, GTI sought to avoid the transfer under 11 U.S.C. § 544(b) and under Florida's Uniform Fraudulent Transfer Act.  GTI also sought disallowance of the claims filed by the Onkyo in GTI's bankruptcy case under 11 U.S.C. § 502(d).  The bankruptcy court conducted a bench trial and issued its findings of fact and conclusions of law and entered judgment in favor of GTI for $6,100,000, plus interest and costs.  Onkyo appeals.

**II. FACTUAL BACKGROUND**

In its Trial Opinion, the bankruptcy court finds that Onkyo overstated OAI's TTM EBITDA (trailing twelve month earnings before interest, taxes, depreciation, and amortization) by approximately $2 million due to accounting errors and adjustments, of which no less than $650,000 were known to OAI, but not disclosed to GTI (Doc. No. 1, Tr. Op. at 27-28).  Further, OAI's TTM EBITDA was overstated by an $839,000 earnings shortfall, and about  $740,000 should have been known before the sale (Id. at 28-29).  Other findings by the bankruptcy court include the following:  OAI's cost savings and sales forecasts were dramatically overstated and unreasonable; GTI's primary sources for due diligence had undisclosed ties to Onkyo, and undisclosed financial incentives for

selling OAI to GTI (Id. at 32); and the indirect benefits provided to GTI had a value of zero or less because OAI was a serious cash drain on GTI from the time of the acquisition forward, a fact that was predictable given information known to Onkyo at the time of the sale, but withheld from GTI (Id. at 35, 39 n.19.).

As a result, the bankruptcy court discounted the opinion of Onkyo's expert witness, Jeff Risius, who based his valuation of OAI on the company's unrealistic projections. Instead, the bankruptcy court credited the opinion of GTI's expert, Van Conway, who used OAI's TTM EBITDA as a basis for determining the company's reasonable future performance. (Id. at 39.) The bankruptcy court deemed the method the "most reliable and least speculative" means by which to evaluate OAI's "reasonably expected future performance." (Id. at 47). The bankruptcy court found the fair market value of OAI's equity on August 31, 2000, to be at most $6.9 million. (Id. at 40, 47.) It also found that after the acquisition, GTI's liabilities exceeded its assets by at least $12.2 million (id. at 47), and therefore concluded that the cash and promissory notes were avoidable fraudulent transfers under Florida law, made applicable by 11 U.S.C. §§ 544 (b) and 550.

## II. FACTUAL BACKGROUND

The Court relies on the facts as articulated in the Trial Opinion, which includes the bankruptcy court's findings of fact and conclusions of law. A summary follows.

GTI developed, manufactured, and sold On-Site Oil Analzers (OSA), a motor oil diagnostic and preventative maintenance program used to diagnose the condition of vehicles. (Trial Op. at 8). The OSA business required large cash outlays to develop and manufacture technology and to create a market. In late 1999, "GTI was a cash poor

company." (Id. at 9.)  It was in danger of delisting by the American Stock Exchange, where its shares were traded.  (Id. at 8.)

Among other things, OAI manufactured and supplied automotive speakers.  In 2000, OAI had 400 employees and operations in Colombus, Indiana and Troy, Michigan.  OAI's clients for automotive audio speakers were original equipment manufacturers in the United States, primarily Tier 1 auto suppliers.  (Id. at 9.)

OAI's Columbus facility had the capacity to produce over one million speakers per month.  (Id.)  Prior to the purchase, OAI's business had been declining, despite record production in the automotive industry.  Consequently, OAI was exploring an expansion of its speaker business to additional sectors in the nonautomotive sector and aftermarket.  (Id. at 10).

At the time of acquisition, Onkyo owned 100% of the outstanding common stock of OAI:  Onkyo Europe owned 2,065 shares; Onkyo Malaysia owned 2,065 shares; and Onkyo Japan owed 1,770 shares.  (Id. at 13).  The Chairman and CEO of Onkyo Japan, Naoto Otsuki, not only controlled Onkyo Japan, he also owned all of Onkyo Electric and Onkyo Malaysia.  (Id.)  Onkyo Japan played an active role in selecting the managing officers of OAI.  For example, in 1999, when revenues and profits declined, Otsuki selected Shinobu Shimojima as president of OAI, despite Shimojima's lack of experience managing automotive, speaker/electronic or manufacturing companies.  (Id.)

Because Onkyo Japan was considering becoming a public company, it had to utilize an existing $28 million tax loss carryforward, and considered selling OAI in order to realize a gain that could be offset by the loss carryforward.  (Id. at 14.)  The first two

attempts to sell OAI were in the form of proposed management buy-outs. Because no lender was willing to provide financing, these efforts failed. A third attempt to sell OAI, to another speaker manufacturing company, also failed. (Id.)

Eventually, Onkyo began discussing a sale to GTI. At that time, GTI was experiencing a cash crisis, and its primary investor, the Mennon Family Trust, refused to invest any more money in the company. (Id. at 16.) GTI was in danger of being delisted by AMEX, which would have been devastating to GTI. GTI believed that OAI generated approximately $6.9 million in excess cash each year; therefore, its purchase would offer a solution to GTI for a continuing source of cash.

On March 30, 2000, GTI and Onkyo entered into a Letter of Intent regarding the purchase. During due diligence, GTI focused on OAI's TTM EBITDA and future sales prospects as the salient measure of OAI's worth. Verification of information was difficult because OAI was a private company at the time of sale, and no public information was available. In addition, explicit sales contracts do not exist in the automotive industry, and OAI's customers were reluctant to release detailed information. Therefore, GTI had to rely on the information provided by OAI. (Id. at 19.) Specifically, Doug Pillow, the CFO for OAI, and Shimojima provided most of the sales and financial data used to project further sales. (Id. at 18.)

GMAC was the only lender willing to participate in the sale. It offered to provide a portion of the acquisition financing and the revolving line of credit on the condition that GTI secure a secondary subordinated lender for the remaining amounts required to purchase OAI. The Mennen Trust agreed to loan $12 million in bridge financing. (Id. at 22.)

GMAC performed due diligence prior to the acquisition. It received current and projected financial information directly from OAI management. (Id. at 23.) The representations led GMAC to believe that OAI's TTM adjusted EBITDA as of August 31, 2000, would be approximately $9 million. (Id.) GMAC hired Duff & Phelps, LLC, to provide an opinion as to the solvency and capitalization of OAI post-acquisition. Duff and Phelps conditioned its opinion on the accuracy and completeness of the information provided by OAI management, when it deemed OAI to be solvent. (Id. at 23-24.)

In addition, OAI's pre-acquisition lender, LaSalle Bank conducted due diligence. LaSalle reviewed OAI's current and projected financial statements as well as projected cost savings. Because LaSalle had concerns, GTI hired Deloitte & Touche to review OAI's projected cost savings. Its analysis assumed the proposed cost saving measures were viable, and it merely confirmed the mathematical accuracy of the projected impact of the savings on OAI's financial statements. (Id. at 22-24.)

The parties closed the sale on August 31, 2000. GTI paid $13 million in cash to Onkyo's agent. In addition, GTI executed and delivered three promissory notes payable in August 2003, for the $12 million balance of the purchase price. (Id. at 24.)

After closing, GTI discovered a number of problems that directly impacted OAI's TTM EBITDA. First, GTI discovered the financial statements required adjustments due to accounting errors that reduced OAI's TTM EBITDA by approximately $2 million. (Id. at 27.) Each error overstated EBITDA; none made it appear lower. In addition to the accounting errors, OAI's July and August earnings shortfalls of approximately $839,000 reduced the TTM EBITDA. (Id. at 28.) GTI's expert witness, Van Conway, testified that

the disparity would have become apparent to OAI in the course of its day-to-day liquidity analysis. (Id. at 29).

Further, projected costs savings and sales forecast were overstated. Pre-acquisition, OAI's management projected approximately $2.7 million in annual cost saving measures. Management neglected to evaluate the feasibility of actually implementing these cost savings measures to ascertain their true value, and most of the savings were not viable. (Id. at 29.) In addition, OAI projected large growth to OAI's baseline automotive, nonautomotive, and aftermarket sales, despite missing its budgeted sales for the first half of the year and in the face of an expected automotive industry decline. No less than three OAI sales managers had informed management that the resales projections were unreasonable and unattainable, and Shimojima and Pillow had no reasonable basis to support the increases. (Id. at 30.) Nevertheless, these projections were provided to GTI and others during due diligence.

After the closing, GTI's and OAI's financial condition worsened. GTI negotiated with Onkyo Japan for amendments to the acquisition transaction, and on January 6, 2001, the Agreement was amended to reduce the principal amount owing under the promissory notes to Onkyo Japan by $1 million, to forgive the interest that had accrued, and to defer payment in intercompany obligations OAI owed to Onkyo Japan. Further, they executed a General Release, under which GTI and OAI released Onkyo from claims relating to the Agreement. (Id. at 37).

OAI's financial condition further deteriorated, and in October 2001, OAI's secured lender GMAC took over the day-to-day operations. (Id.) On November 21, 2001, GTI wrote to Onkyo Japan discussing the possibility of OAI being forced into bankruptcy and

of GTI filing bankruptcy to set aside the OAI acquisition as a fraudulent transfer. On December 18, 2001, GTI and its affiliates filed voluntary petitions for relief under chapter 11. (Id. at 38.) OAI filed the following day. (Id.) Onkyo filed proofs of claims in the bankruptcy case: Onkyo Europe and Onkyo Malaysia filed a proof of claim in the amount of $4,229,891, Onkyo Japan filed a proof of claim in the amount of $3,625,621.08.

On February 21, 2003, the bankruptcy court entered a confirmation order confirming GTI's plan of reorganization. Thereafter, GTI and the Liquidating Agent for OAI filed an adversary proceeding, which included GTI's claim to avoid and recover as fraudulent, transfers to Onkyo as part of the acquisition of the OAI common stock.

At the conclusion of the trial, the bankruptcy court issued its 75 page order, concluding that GTI did not receive reasonably equivalent value in stock and other benefits for what it paid–the cash and notes.

## III. STANDARD OF REVIEW

In a bankruptcy proceeding, the bankruptcy judge is the finder of fact, In re Isaacman, 26 F.3d 629, 631 (6th Cir. 1994), and factual findings for reviewed for clear error. Id. Accordingly, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." FED. R. BANKRUPTCY P. 8013; In re Baker & Getty Fin. Servs., 106 F.3d 1255, 1259 (6th Cir. 1997) ((noting that the appellant must demonstrate "the most cogent evidence of a mistake of justice"). Conclusions of law are reviewed de novo. In re Zaptocky, 250 F.3d 1020, 1023 (6th Cir. 2001).

**IV.   ANALYSIS**

The law is clear, GTI may avoid any transfer of an interest it holds in property or any obligation it has incurred when it is voidable "under applicable law by a creditor holding an unsecured claim, and may recover the property transferred or the value of such property for the benefit of the estate." (Doc. No. 1 Tr. Op. at 50.)  In this case, under Florida law, GTI sought to avoid the cash transfer and promissory note obligations.  See FLA. STAT. § 726.201(1).  The bankruptcy court analyzed the facts of the case and determined that GTI showed, by a preponderance of evidence, that

> (1) an actual creditor exists whose claim arose before the transfers and obligations; (2) that GTI received less than reasonably equivalent value in exchange for the transfer or obligations; and (3) that GTI was either insolvent at the time, or became insolvent as a result of, the transfers and obligations.

(Doc. No. 1 Tr. Op. at 50, (citing FLA. STAT. § 726.201(1).)  Accord 11 U.S.C.§ 548(a)(1) (authorizing avoidance a transfer "of an interest of the debtor in property" if the debtor "received less than a reasonably equivalent value in exchange for such transfer," and "was insolvent on the date that such transfer was made").

Onkyo challenges whether the second and third criteria were met.  Specifically, Onkyo asserts that the bankruptcy court erred when it held that GTI did not receive reasonably equivalent value when it acquired OAI, and that the bankruptcy court abused its discretion by allowing GTI's expert to testify that GTI was insolvent as a result of the transaction.  The Court directs its attention first to the issue of reasonably equivalent value.

9

### A. Reasonably Equivalent Value

The term reasonably equivalent value is not defined in the statute. In assessing this value, "courts generally consider many factors, including the good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length." Menchise v. Clark (In re Dealers Agency Servs.), 380 B.R. 608, 619 (Bankr. M.D. Fla. 2007). This determination is "largely a question of fact;" therefore, "considerable latitude must be allowed to the trier of the facts." In re Chase & Sanborn Corp., 904 F.2d at 593 (addressing guarantee as reasonably equivalent value for loan and noting reasonably equivalent value is largely a question of fact) (quoting Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823, 829-30 (5th Cir. 1959) (applying the standard of review to findings of "reasonably equivalent value" under § 548)). Under Florida law, if the debtor received 70% or less than the value given, the debtor has established a lack of reasonably equivalent value. Bakst v. Levenson (In re Goldberg), 229 B.R. 877, 884-85 (Bankr. S. D. Fla. 1998).

In the case, the bankruptcy court concluded that GTI received less than 70% because GTI paid $21.6 million and received equity in the amount of $6.9 million. When the buyer does not clearly establish either (1) the value of the assets transferred, or (2) the amount that it received in the transaction," the buyer does not "satisfy its burden of proving that the transfer was constructively fraudulent. In re Dealers Agency Servs., 380 B.R. at 620, 622. Onkyo challenges both findings–the value given and the value received.

### 1. Value Given

According to the bankruptcy court, GTI gave $13 million in cash and promissory notes with a present value of $8.6 million, for a total of $21.6 million. The reduction in the value of the promissory notes to $8.6 million mirrors the opinion offered by Jeff Risius, Onkyo's expert, as to the market rate for unsecured debt. Risius also concluded that the transaction did not render GTI insolvent.

According to Appellants, the bankruptcy court erred because when it adopted the reduction in the face value of the promissory notes it also had to adopt Risius' conclusion as to solvency. The Court disagrees. There is no requirement that the trier of fact must adopt an expert's opinion in its entirety. Specifically, the discount rate to be applied to unsecured debt is not inextricably tied to GTI's solvency. In contrast to the authority cited by Onkyo, here, there was no finding by the bankruptcy court that GTI was insolvent when it executed the notes. Compare Unencumbered Assets Trust v. Biomar Techs., Inc. (In re Nat'l Cent. Fin. Enters., Inc.), 341 B.R. 198 (Bankr. S.D. Ohio 2006). In sum, the Court rejects the argument that GTI failed to prove the value of everything it transferred when it acquired OAI, and, therefore, the reasonable equivalent value cannot be assessed.

### 2. Value Received

Next, Onkyo challenges the $6.9 million value given by the Bankruptcy Court to OAI stock. Appellants maintain that the value disregards the pre-transaction projection of new business and other benefits. Specifically, Onkyo contends that at the time GTI closed the deal, GTI received other benefits, including avoiding delisting by the American Stock Exchange, access to substantial credit and approximately $3 million in

cash immediately after the transaction, exclusive distribution rights for Onkyo's automotive speakers in the Americas, access to Onkyo's patents, trademarks, trade names, technologies, and technical assistance, the ability to move production of GTI oil analyzers to a state-of-the-art production facility in Columbus, Indiana, and enhanced credibility in the eyes of automotive manufacturers–potential customers for GTI's other product lines.  (Doc. No. 11 at 17.)

It is undisputed that case law does countenance assessment of such benefits to determine whether reasonably equivalent value is given.  See Allard v. Flamingo Hilton (In re Chomakos), 69 F.3d 769, 771 (6th Cir. 1995) (noting that the potential for future economic gain is value); Mellong Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 63, 68 (3d Cir. 1991) (synergies from a transaction and ability to obtain credit constitute real value).  Under Appellants' theory, the value received by GTI exceeds the 70% guideline.  Notably, the stock alone constitutes 53% of what GTI paid in cash, and had the bankruptcy court properly assessed the additional value of the indirect benefits identified above, the 70% level deemed presumptively reasonable would have been met.  Consequently, the value of all the benefits to GTI becomes critical and demonstrates why bankruptcy courts are required to "[e]xamine all aspects of the transaction and carefully measure the value of all benefits and burdens to the debtor, direct or indirect."  Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke dev. Corp.), 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991).  According to Onkyo, the error is compounded by GTI's failure to provide any evidence of the value of the nonstock benefits.

The bankruptcy court addressed these arguments in its Trial Opinion, noting that other than the delisting, the net value to GTI of these benefits was less than zero because GTI suffered economic damages from acquiring OAI.  In characterizing these benefits as "highly speculative and in fact. . .unachieveable," the bankruptcy court did not rely on hindsight.  In re Chomakos, 69 F.3d 767, 770-771 (6th Cir. 1995) (noting that "[t]he critical time is when the transfer is 'made' [and] [n]either subsequent depreciation in nor appreciation in value of the consideration affects the. . .question whether reasonable [sic] equivalent value was given").  These anticipated indirect benefits were assessed as of the date of closing.  Their value was ascertained based on the information known to the management of OAI at the time of acquisition, not on the information as it was presented to GTI.  As noted by GTI's expert, any value was undermined by the cash drain on GTI from the time of acquisition.  (Doc. No. 1, Tr. Op. at 39 n. 19.)

Next, Appellants urge this Court to reject Conway's testimony because he alone cast the benefits as speculative and lacking in value.  The Court declines to do so; the bankruptcy court does not commit error in crediting the testimony of one witness over another.  That is precisely its duty as finder of fact.  Further, this Court disagrees with Appellants, that the testimony lacked substantive analysis, inasmuch as Conway admitted that he would not have wasted his time on these representations, given the lack of substance behind them.  He saw no evidence of their value because the representations made by OAI's management, who had undisclosed ties to Onkyo Japan and undisclosed financial incentives for selling OAI to GTI, lacked a factual basis.  Therefore, the fact that "the ability to obtain credit is the lifeblood of the commercial

13

world," does not alter this Court's analysis. Here, the bankruptcy court "ha[d] sufficient evidence to conclude, based on a totality of circumstances, that the benefits to the debtor [we]re minimal and certainly not equivalent to the value of a substantial outlay of assets." Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No.003 (In re Fruehauf Trailer Corp.), 444 F.3d 203, 214 (3d Cir. 2006). As it noted, "OAI was a serious cash drain on GTI from the time of the acquisition forward." (Tr. Op. at 39). The indirect benefits were an illusion.

Finally, the Court rejects Onkyo's assertion that its inability to present OAI's contracts and purchases orders resulted from GTI's failure to preserve the evidence. The bankruptcy court recognized that GTI had documentation at the time of closing supporting projections of new OAI business, including contracts and purchase orders, but concluded that GTI was not responsible for any missing documents or records. (Tr. Op. at 71). Instead, the bankruptcy court attributed the missing documents to Onkyo's own failure to provide the documents to GTI and OAI, the request by Shimojima that documents be destroyed when he left OAI in 2001, and GMAC's failure to preserve the evidence during asset liquidation. (Id. at 72). This finding is not clearly erroneous. In sum, the Court concludes that GTI did not receive reasonably equivalent value when it purchased OAI's stock. Consequently, the Court turns its attention to the issue of solvency.

### B. Solvency

Conway testified that the transaction rendered GTI insolvent, unable to pay its debts as they came due as of the date of closing. Onkyo contends that this testimony was impermissible because Conway failed to evaluate GTI's solvency on a stand-alone

basis. In the expert report that was disclosed to Onyko, Conway considered the assets and liabilities of GTI and all of its subsidiaries. Conway admitted in his deposition that he had never been asked to render an opinion on whether GTI itself was rendered insolvent by the transaction.

After discovery closed, Onkyo Defendants moved to exclude Conway's opinion as noncompliant with Rule 26(a)(2)(B)(i), which requires all expert reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." FED. R. CIV. P. 26(a)(2)(B)(i). In response to the motion, GTI offered a new opinion from Conway, evaluating GTI's solvency on a stand alone basis.

After hearing argument on the motion, the bankruptcy court concluded that excluding the new opinion was not warranted under Rule 37(c)(1), which states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). The bankruptcy court found that exclusion did "not fit the harm visited on [Onkyo] or the prejudice [it] suffered." (Bankr. Doc. 152 at 104.) Instead, the bankruptcy court ordered GTI to pay the costs incurred by Onkyo for having to depose Conway again. In formulating this sanction, the bankruptcy court determined that Onkyo had not been prejudiced in its ability to prepare for trial. (Bankr. Doc. 152 at 103-104.)

Review of this sanction is rendered under an abuse of discretion standard. In re Wingerter, 594 F.3d 931, 935-36 (6th Cir. 2010). An abuse of discretion occurs where the reviewing court has "a definite and firm conviction that the court below committed a

clear error of judgment." Barlow v. M.J. Waterman & Assocs., Inc. (In re M.J. Waterman & Assocs., Inc.), 227 F.3d 604, 607-08 (6th Cir. 2000) (citation, alterations, and internal quotation marks omitted). "The question is not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision; if reasonable persons could differ as to the issue, then there is no abuse of discretion." Id. at 608.

After reviewing the record, the Court finds the bankruptcy court did not abuse its discretion when it declined to exclude the opinion of GTI's expert. Clearly, GTI did not comply with Rule 26 in accordance with the deadlines established in the scheduling order. More importantly, however, Onkyo has not shown that the bankruptcy court's finding that Onkyo was not prejudiced by GTI's conduct is clearly erroneous.

## V.    CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the bankruptcy court's Trial Opinion and Judgment are **AFFIRMED.**

**IT IS SO ORDERED.**

                                                           s/Marianne O. Battani
                                                           MARIANNE O. BATTANI
                                                           UNITED STATES DISTRICT JUDGE

DATED: March 31, 2011

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt
Case Manager